Filed 1/22/14  P. v. Brown CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>MARCUS JEROME BROWN,<br><br>　　　　Defendant and Appellant. | A139059<br><br>(Solano County<br>Super. Ct. No. FCR252740) |

Marcus Jerome Brown appeals from the revocation of probation and execution of a previously suspended sentence.  His court-appointed counsel has filed a brief raising no legal issues and requesting this court to conduct an independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436.  The appeal is authorized by Penal Code section 1237.[1]

**BACKGROUND**

On December 2, 2008, nearly five years ago, appellant pled no contest to two counts of corporal injury on a spouse or cohabitant (§ 273.5, subd. (a)), and admitted a prior prison enhancement (§ 667.5, subd. (b)).  Pursuant to the plea agreement, a related great bodily injury enhancement (§ 12022.7, subd. (a)) was dismissed, execution of a five-year state prison term was suspended, and probation was granted.  On February 2, 2009, the court imposed the agreed upon term, which consisted of the three-year midterm on count one, a consecutive one-third the midterm of one-year on count two, and a

---

[1] All statutory references are to the Penal Code.

1

consecutive one-year term on the prior prison term enhancement.  Appellant was released on a five-year grant of probation subject to standard conditions and also no contact orders relating to the victim of his offenses.

Appellant admitted previously violating the terms of his probation on three occasions—by variously failing to attend domestic violence treatment programs, submit to drug testing, and abstain from illegal drugs.  On February 1, 2011, after one such admission, appellant agreed to waive his past, present, and future credits in exchange for reinstatement to probation.

When appellant admitted violating probation on May 9, 2011, the trial court lifted the stay and executed the previously suspended five-year prison term.  The court then recalled that sentence pursuant to section 1170, subdivision (d), and reinstated and modified probation so that it included participation in a one-year residential drug treatment program.  Appellant again agreed to waive all accrued credits in the event he violated probation again.

On March 25, 2013, appellant was arraigned on the present probation violation based on allegations that he had failed to complete a one-year domestic violence program and submit to drug testing.  Appellant contested the allegations  and a hearing was held on April 9, 2013.

### The Revocation Hearing

Three witnesses testified at the revocation hearing: Solano County Probation Officer Ruben Vang, appellant, and Terri Sullivan, a social worker who teaches domestic violence prevention at the Archway Recovery  program and has been "in an intimate relationship" with appellant for four years, the entire period of his probation.

Officer Vang stated that at a meeting with appellant on December 26, 2012, he directed him to submit to a drug test but appellant left the building without doing so.  At the same meeting, after telling appellant only a short time remained on his probation, Vang directed him to enroll in a domestic violence program and bring verification that he had done so to his next appointment.  Appellant never presented any such verification.

2

On cross-examination, Vang acknowledged that, until recently, appellant's probation had been supervised by Andrea Rogers who, unlike him, specialized in supervising probationers who participated in the type of treatment programs petitioner had been participating in, and was familiar with the demands they imposed. Vang was aware that, since mid-2011 and for more than a year, appellant had been living in a residential domestic violence program known as Archway; had during that period become a member of Local 342 Pipe Fitters Union, and was also enrolled in an educational program related to his work as a pipe fitter. Vang did not know that appellant's job, to which he carpooled because he did not have a car, required him to leave Solano County at 5:00 a.m. and made him unable to return earlier than 8:00 p.m.

On redirect, Vang stated that appellant had never provided him any documentation regarding his school schedule, and that drug testing took place in his office on the days appellant met with him there. On recross, Vang admitted that the previous day appellant's counsel had shown him appellant's pay stubs indicating times at which he had been employed.

Appellant testified that in December 2009 he had been diagnosed with an aortic heart valve problem for which he "had to be hospitalized numerous times . . . for weeks on end," and he ultimately had open heart surgery to replace his heart valve, and almost died. The valve now needs to be replaced every five years. Appellant stated that at present "I'm about 75 percent of what I was."

Appellant testified that he entered the Archway program on July 8, 2011, as Judge Foor ordered him to do, and left after graduating in November of 2012, which was longer than the one-year period ordered by Judge Foor. He stayed in the program longer than ordered because he would otherwise have been homeless, and unable to comply with many conditions of his probation. Appellant paid for his room and board at Archway by using all of the disability checks he received from the state and help he received from Terri Sullivan, his "significant other," who taught a class in the program. While living at and participating in the Archway program, appellant also attended an Archway job

3

training program, and worked at Kentucky Fried Chicken about 10 hours a week, as a result of which his state assistance ceased.

In November 2011, shortly after he began participating in and living at the Archway program, appellant signed up to take a pipe fitter test given by Local 342, and was one of only 40 of 1,200 applicants accepted in the union's apprenticeship program. After participating in a job training program at Diablo Valley Community College, appellant was assigned a job at Russell City Energy Center in Hayward, and later at Bechtel and perhaps other companies, as "an apprentice pipe fitter welder."[2]

Appellant described his workday during this period, which apparently lasted until his probation was revoked, as follows. He would leave home in Solano County "at 5:00 a.m. every morning to be at work by 7:00. After work he took evening classes in Concord for 6 to 12 hours a week, so he would usually not get home until 9:30 [p.m.]." Because appellant was participating in an apprenticeship program he was unable to ask for time off. If he had, he stated, "I would have been expelled from school. I would have been fired from my job, and I would have been pretty much not been able to, you know, survive or take care of myself or, you know, be on any sort of decency with the Court on my conditions of probation." Appellant stated that completing the apprenticeship program presented "[t]he chance of a lifetime."

However, although appellant avoided being laid off for three months, he was eventually laid off in March 2013, shortly before the revocation hearing, "actually, the day after my last visit with agent Vang" on March 6.[3] Appellant stated that he tried but was unable to contact Vang earlier.

---

[2] Appellant authenticated  and offered in evidence (1) pay stubs he received from Russell City Energy Center and Bechtel establishing the times of his employment with those companies, (2) a letter to him from the Northern California Pipe Traders Trust Fund identifying the amount of his contributions to that Fund, and (3) a document from the Local 342 establishing the period of his enrollment in the union's joint apprenticeship and training program.

[3] Appellant testified at the revocation hearing that, if not in custody, having been laid off would not prevent him from remaining in the apprenticeship program.

4

Appellant said he was unable to submit to a drug test the day he met with Vang due to his inability to previously sign up for medical insurance coverage for his children, as he had been court ordered to do in a civil action commenced by the mother of his child. The day he met with Vang, December 26, was the last day he could sign up for the coverage so that it would commence on January 1st, as required. Getting this coverage was of immense importance, not just because of the medical needs of his child, but also because of his own serious heart problems. Appellant knew he could test for drugs the week after he met with Vang, but that would require him to miss work. Appellant explained, "I carpool[ed] to work, and with the looming layoffs, missing work was something that was not smiled upon . . . . I would have got fired from my job, you know. . . . Bechtel was very upset with people missing days and stuff like that. [¶] . . . [¶] . . . I did not choose the job over testing, not at all, but to get back to this area [for the drug testing] was really difficult for me without a vehicle.

Asked why he missed a drug test at the time he met with Vang in March, appellant stated that the meeting was scheduled at 4:00 p.m. and he tried to return from work to get there on time, but by the time he arrived the office had closed. Appellant added that at that time he was not using drugs because of the serious requirements of his job, as well as those of probation. Also, at that time he was still residing at the Archway program where he was tested for drugs on a regular basis. He never tested positive at Archway, and would have been "expelled and kicked out," which never happened.

Appellant said he was unable to complete a 52-week domestic violence treatment program while residing at the Archway program because Archway did not permit residents to participate in other programs. After leaving Archway, his work and school schedule made it hard to immediately enroll in the separate year-long domestic violence counseling program the court had ordered. However, after he lost his job he contacted the domestic violence program "numerous times" to verify that there was an opening for him in the 52-week program, and made an appointment at which he planned to enroll. He was unable to show up for appointment that day because he was incarcerated, apparently on the basis of the probation violation.

5

Examined by the district attorney on re-cross, appellant admitted he tested "dirty" for drugs in 2011 and that he failed to complete the domestic violence counseling program he started in 2009. Acknowledging he did not submit a check stub showing he worked Christmas week in 2012, appellant stated he nevertheless did work that week; and during that period and in early January 2013 he typically worked "from 60 to 70 to 84 hours a week." Appellant also allowed that his school was not in session during June, July and early August 2012, and it also closed for Christmas—implicitly acknowledging he could then have attended the domestic violence counseling class made a condition of his probation.

Terri Sullivan, who has been in "an intimate relationship" with appellant for four years, almost the entire period of his probation, testified that there has never been "any physical or verbal problems" between her and appellant, and their relationship has been "peaceful" and "positive." Sullivan helped appellant pay for the Archway program, had a bachelor's degree in social work and previously served as a "domestic violence program manager" at other programs, and was now a teacher of domestic violence prevention at the Archway program from which appellant graduated. She knows from her training what a person on narcotics or drugs looks like and how he behaves, and never saw appellant look or act in that way. She never saw him use marijuana, methamphetamine or cocaine.

At the close of testimony, the court heard from the district attorney and defense counsel.

According to Deputy District Attorney Kathleen Murray, appellant violated his probation in three ways: First, he was on December 26, 2012 ordered by Officer Vang to submit to drug testing and, according to Vang, there were two days that week available for testing from 8:30 a.m. to 5:00 p.m., and "defendant failed to comply with that order [and] [t]here's no verification that he was working that week . . . or that he was in school that week, and he could have complied with that term and he chose not to."

6

Second, appellant "failed to test on the following week when he was ordered to do so, and he did not complete the test on that day, and there was no information provided as to why he did not test that particular day."

Finally, appellant "failed to complete his domestic violence counseling program. He's been on probation now since 2009, and he's failed to complete that program. His work schedule does vary. His school schedule does vary. He was taking courses at Archway, but he failed to complete that class. He testified that that program was not available to him, but that was in direct contradiction to what Ms. Sullivan testified to."

The foregoing reasons were the sole basis upon which the district attorney asked the court to hold appellant in violation of his probation.

After offering into evidence documents establishing the dates of appellant's employment during the period of his probation, and the dates of the educational courses and treatment programs he participated in, Deputy Conflict Defender Marjaneh Maroufi urged the court to "reject any finding of willful violation of probation in this case."

First, with respect to the 52-week domestic violence class, she pointed out that appellant was between "a rock and a hard place. To comply with the order . . . he would have had to violate other terms of probation. He was just not able to comply with all terms of probation at the same time." As she explained, "[w]hile at the Archway Program, he had to comply with their rules and policies. He could not be in any other programming but theirs. Furthermore, they required him to work, and an amazing job opportunity and educational opportunity landed at his feet, and Mr. Brown jumped at the chance at being in this Local Union 342. . . . [He] has testified credibly and honestly that he worked a very long day leaving at approximately 5:00 a.m. in the morning, getting back very late in the day. No domestic violence program is available at the hours that he is essentially home, um, at about 8:00 or 9:00 [p.m.] During a period that he described from January of 2012 to very recently until March where he lost his job, he was going to school and work at the very same time, and he carried this on for several months until he was laid off. Once he was laid off, he made the appointment with the 52-week [domestic violence] program, but he was remanded and unable to continue in that regard." Defense

7

counsel observed that because appellant's period of probation ended in June 2014, he could still complete the domestic violence program if his probation was not revoked.

Counsel summed up her first point by emphasizing the significance of the job training and work experience appellant obtained from his participation in the union apprenticeship program and employment at the Energy Center in Hayward and Bechtel to his long-term rehabilitation and reintegration into society, and the difficulty of having to choose between those extraordinary opportunities. The difficulty of that choice, and also the fact that the Archway program—which included domestic violence prevention classes and also subjected appellant to periodic drug testing—did not permit him to simultaneously participate in another treatment program, established that his admitted, but minor, violations of probation were not "willful," as had to be the case in order to revoke his probation.

Defense counsel's second argument, which related to the drug testing condition, was that appellant was tested at least twice monthly at Archway "and never once did he test dirty." Terri Sullivan testified that she never saw any indication he used drugs and the only evidence to the contrary is appellant's own admissions that he had backslided in 2011, which past incidents were not relied upon by the district attorney as a basis for revocation, which was sought only on the ground of his recent failure to submit to drug testing by the probation department at times of day that would have cost him his job and membership in the apprenticeship program. From appellant's perspective, she said, "it was essentially testing or lose the job." "[C]onsidering that at the time of testing appellant had completed more than a year-and-a-half of a residential treatment program, tested repeatedly, never once testing dirty," counsel asked the court "to consider that as a mitigation, as substantial compliance with probation," noting also that appellant had not reoffended since 2007.

Defense counsel argued that, unlike most probationers who violate probation, who "do nothing at all" to rehabilitate themselves, "we have the opposite . . . he did too much. He grabbed every opportunity he could get." Lamenting the fact that the probation department "didn't seem like they were terribly interested" in appellant's efforts to better

8

himself, counsel maintained that it should not have obstructed them, and punished him by initiating revocation proceedings.

### *The Trial Court Ruling*

On April 9, 2013, the trial court rejected the probation department's recommendation. Focusing on appellant's prior failures to comply with the conditions of probation, the trial court observed that "when the defendant was first violated for this, his explanation was that he couldn't attend these meetings because he was busy working. . . . He had more important things to do. He had to work, so he couldn't go to his meetings. Well, I put him back on probation. [¶] And after that, he had these medical issues he just testified he almost died from. So it's interesting that the next violation, which occurs within just a few months after he has been getting this treatment for these medical issues [i.e., open heart surgery], was for failure to drug test and failure to complete the DV course. Now, this time his explanation was he was too busy with his medical appointments, couldn't go to DV, couldn't do any of this and he never really had any explanation, except . . . [h]e did acknowledge that he was missing his drug test because he was going to test positive for marijuana because he wanted to get his weight back up." Three months after he was allowed to remain on probation, the court observed, he committed the present violations.

Concluding that appellant is "clearly in violation for not testing [and] for failing to enroll into the domestic violence counseling program, as he was directed to do." "[W]hat I really get out of all of this," the court stated, "is that Mr. Brown is extremely manipulative. He's going to do what he wants to do when he wants it, and I have no doubt that a job that's paying $20, $25 an hour is a good job. There's no question about that. But he . . . knows full well the obligations that he had to test because the thing is without sobriety all of this other stuff is meaningless. And his sobriety is seriously in question when he won't test, and he always has an explanation. I assume he's not testing because he's dirty, and when you're dirty, all this other stuff doesn't matter because . . . he's spent a lifetime being dirty and committing crimes. [¶] Now, it's true that he made some positive steps during the time that he was in Archway, but it looked to me like he

9

was back sliding from the moment he left the program. By the time he got to probation, he wouldn't test. He wouldn't provide them any verification of any of this. He wouldn't sign up for his domestic violence and always with another explanation."

After finding appellant in violation of his probation, the court referred the matter back to the probation department for a supplemental report and recommendation, and set the case for judgment and sentence in four weeks, on May 7, 2013.[4]

### *The Probation Department Recommendation*

The supplemental report filed with the court on May 7 outlined the several competing considerations. On the one hand, appellant seemed genuinely remorseful for violating his probation for the fourth time and his failure to miss appointments with his probation officer and for drug testing appeared to be due to the demands of his "employment and education" (i.e., participation in an apprenticeship program). On the other hand, appellant admitted that a recent failure to submit to drug testing was the result of his knowledge that he would test positive if he complied. The supplemental report also noted that appellant "had an opportunity to address his use of illegal drugs when he entered Archway Recovery Services," a state-licensed alcohol and drug treatment program, but "information received from Archway appears to indicate that [appellant] may have received limited benefit due to his own non-compliance."

The supplemental report considered it significant that the Archway program only addressed drug abuse, whereas the probation department felt appellant needed a program that also addressed "behavioral modification" such as "the Delancey Street and Genesis House programs," which "can provide both substance abuse treatment and behavioral modification." For that reason, the supplemental report recommended a four-week continuance be granted to allow appellant the opportunity to seek admission into Delancey Street or Genesis House, or a similar program.

---

[4] The record contains no transcript of proceedings on that date, however it does contain a Criminal Minute Order dated June 3, 2013, denying continuation of probation and imposing the previously suspended sentence.

10

Genesis House accepted appellant as a participant on May 21, 2013. Less than two weeks later, the probation department submitted an addendum to its Supplemental Report stating that "[a]lthough [appellant's] acceptance into Genesis House avoids a recommendation for imposition of sentencing at this time, it should be noted that he is assessed as a marginal candidate for successful completion. . . . Therefore, it is respectfully recommended that [appellant] waive all custody credits as a consequence of the violation to encourage his compliance with this final opportunity to complete probation. It is recommended that [appellant] remain in custody until arrangements are made for his transport to the Genesis House."

### *The Trial Court's Judgment and Sentence*

On June 3, 2013, the trial court denied continued probation and remanded appellant to serve the previously suspended sentence. Credits of 71 actual days served and 71 days of good conduct were determined, for a total of 142 days presentence custody credits. The court imposed a $400 restitution fund fine, a probation revocation fine in the same amount, and a parole restitution fine also in the amount of $400, that was suspended unless parole was revoked.

This timely appeal was filed on June 25, 2013.

### DISCUSSION

"Revocation rests in the sound discretion of the court. Although that discretion is very broad, the court may not act arbitrarily or capriciously; its determination must be based upon the facts before it." (*People v. Buford* (1974) 42 Cal.App.3d 975, 985.)

"A court may revoke probation 'if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation officer or otherwise that the person has violated any of the conditions of his or her probation . . . .' (§ 1203.2, subd. (a).) 'As the language of section 1203.2 would suggest, the determination whether to . . . revoke probation is largely discretionary.' (*In re Coughlin* (1976) 16 Cal.3d 52, 56.) '[T]he facts supporting revocation of probation may be proven by a preponderance of the evidence.' (*People v. Rodriguez* (1990) 51 Cal.3d 437, 439.) However, the evidence must support a conclusion the probationer's conduct constituted a willful

11

violation of the terms and conditions of probation.  (See *People v. Zaring* (1992) 8 Cal.App.4th 362, 378-379 [(*Zaring*)].)"  (*People v. Galvan* (2007) 155 Cal.App.4th 978, 981-982 (*Galvan*).)

Because he did not in the trial court dispute the allegations that he failed to comply with conditions of his probation requiring him to submit to drug testing and enroll in a domestic violence treatment program, appellant essentially concedes that he violated the terms of his probation.  The only potential issue in this case is whether, as the trial court impliedly found, his violation was willful.

*Galvan, supra*, 155 Cal.App.4th 978 and *Zaring, supra*, 8 Cal.App.4th 362, which reversed revocations of probation, are instructive as to whether appellant's violations may be deemed willful.

In *Galvan,* the trial court revoked the defendant's probation stemming from his conviction for burglary and possession of a controlled substance.  Defendant was instructed to report to the probation office within 24 hours of reentry if he left the United States.  After he failed to appear for a probation revocation hearing, a bench warrant was issued.  Several months later the defendant was arrested in the United States.  He presented evidence that his deportation to Mexico prevented him from reporting after his release from jail.  The record contained no evidence of when the defendant re-entered the United States.  Finding the evidence insufficient to show he had been in the United States more than 24 hours before he was arrested, the court reversed the judgment revoking probation, stating that "deportation obviously prevented him from reporting in person.  We also believe a reasonable person in Galvan's position would have assumed that, in these circumstances, the 24-hour reporting requirement would be excused."  (*Galvan, supra*, 155 Cal.App.4th at p. 985.)

In *Zaring, supra*, 8 Cal.App.3d 362, a defendant who plead guilty to possessing and being under the influence of heroin was placed on probation and ordered to appear at 8:30 a.m. for a hearing on her acceptance into a drug program.  Due to a childcare problem unexpectedly requiring the defendant to take her children to school herself, she appeared at the hearing 22 minutes late.  Due to her failure to appear "on time," the trial

12

court found she had willfully violated the terms of her probation, terminated probation, and sentenced her to prison. In doing so, the trial court emphasized that it had given the defendant a "substantial break" because "I thought that she . . . was finally going to get her life together. I think the . . . lawyer for the People even thought she was going to get her life together." (*Zaring*, at p. 377) Because he believed the defendant had never learned that her acts had consequences, the trial judge "told Miss Zaring in a long speech that she had to be here at 8:30, and the most important thing in her life was to be here at 8:30 [a.m.], and if she wasn't here at 8:30 she was going to prison. And I told her she should camp out here if she thought she was going to be late. Then she said, "Yes, I will. I understand. I'll be here." Then she came in and she said, well, she took her children to school. [¶] 'Understand, I let her out early, so had she not been there I don't know how the children would have gotten to school or if they would have gotten to school. She chose to take her children to school and willfully violated that directive and agreement that we had. And so I find her in violation of her probation.' " (*Ibid*.)

The common feature of *Galvan* and *Zaring* is that nothing in the record in those cases supported the conclusion the conduct relied upon to revoke probation "was the result of irresponsibility, contumacious behavior or disrespect for the orders and expectations of the court." (*Galvan, supra*, 155 Cal.App.4th at p. 983.)

That is hardly the case here. Were this appellant's first or second probation violation, it would be far easier to credit the explanations he offered for his failure to test for drugs and enroll in a domestic violence treatment program; but these failures are his *fourth* violations. The trial court's findings that appellant's "sobriety is seriously in question when he won't test, and he always has an explanation," and that he was "manipulative," amount to a credibility determination. On this record, such a determination cannot—even arguably—be set aside by an appellate court.

On December 18, 2013, we issued an order granting appellant 15 days within which to file a supplemental brief in propria persona. Though the brief was not filed with the court until January 7, when it was 5 days late, it was accepted for filing. Appellant's supplemental brief contends that: (1) defense counsel provided him ineffective

13

assistance; (2) the trial court was biased and the sentence it imposed constituted an abuse of discretion; and (3) the court also improperly denied him 2,018 days of credits pursuant to sections 2900.5 and 4019. We have examined these contentions and find each of them meritless.

Appellant was at all times represented by competent counsel who protected his rights and interests.

The trial court had discretion to revoke appellant's probation and impose the previously suspended sentence, and the term thereof is authorized by law and not an abuse of discretion.

Our independent review having revealed no arguable issues that require further briefing, the judgment, including the sentence imposed, are affirmed

_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Richman, J.